IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| DONALD J. HUNT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06-3205-CV-S-NKL-SSA |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

This suit involves an application for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401, *et seq*. On December 9, 2005, following a hearing, an Administrative Law Judge (ALJ) found that Plaintiff Donald J. Hunt ("Hunt") was not disabled as defined by the Act. (Tr. 19-32.) On March 24, 2006, the Appeals Council of the Social Security Administration denied Hunt's request for review. (Tr. 9-12.)

Pending before the court is Hunt's Motion for Summary Judgment [Doc. # 7] seeking judicial review of the ALJ's decision. Because the Court concludes that the decision of the ALJ is supported by substantial evidence, Hunt's Motion for Summary Judgment is denied.

**I.    Overview**[1]

---

[1]Portions of the parties' briefs are adopted without quotation designated.

Hunt was born in 1958 and was 47 years old at the time of his hearing. He is a high school graduate and has worked as a machine operator in the past. (Tr. 118, 123.) Hunt complains of back and leg pain resulting from a work-related injury.

For purposes of this application, Hunt alleged that he became disabled on April 16, 2004. (Tr. 104.) Hunt previously filed an application for disability benefits on April 15, 2002, alleging that he became disabled on August 10, 1999. (Tr. 72.) On April 15, 2004, after an administrative hearing, an ALJ found that Hunt was not disabled. (Tr. 70-83.) Hunt did not appeal the ALJ's previous decision.

### A. Summary of Medical Records

On multiple occasions since 1999, medical personnel have examined Hunt's complaints of back and leg pain. On March 19, 1999, Dr. Timothy Gray examined Hunt. An MRI performed at that time revealed degenerative arthritis of the lumbar spine and degenerative disc disease. (Tr. 300.)

During a six week period beginning on July 13, 1999, Dr. David Madison examined Hunt's back pain complaints and treated him nine times. Hunt's symptomatology, however, did not improve over the course of the treatments and Dr. Madison recommended that chiropractic care be discontinued. (Tr. 147-168.)

On September 20, 1999, Dr. Neil Chafetz examined Hunt. A CT of the lumbar spine revealed calcified posterior L5-S1 right-sided disc bulge extending into the central canal and into the right neural foramen. (Tr. 206.)

2

An October 6, 1999 CT scan revealed lateral gutter stenosis on the right at L5-S1 due to a combination of facet hypertrophy as well as a calcified disc protrusion. (Tr. 295.) Dr. Gray diagnosed back and right leg pain secondary to lateral gutter stenosis at L5-S1 and suggested epidural steroid injections. Dr. Gray discontinued Hunt's physical therapy. (Tr. 295.)

Dr. James Whitehouse treated Hunt's back pain from October 26 to December 2, 1999. On three occasions, Hunt was treated via a lumbar epidural block with steroids. (Tr. 173-199.)

On December 1, 1999, Hunt reported to Tony Morales, P.A. that he had elevated blood sugar. Morales diagnosed Hunt with diabetes, poor control. (Tr. 320.)

A January 13, 2000, x-ray of Hunt's lumbar spine revealed a degenerative spurring at L4 and L5. (Tr. 290.) On February 2, 2000, Hunt sought relief for an intermittent ache in the low back and numbness in both calves. Dr. Gray diagnosed status post bilateral L5-S1 laminotomy and partial medial facetectomy. (Tr. 289.)

From April 12, 2000 to March 13, 2002, Hunt was treated by Dr. Jan Maddox at the Community Pain Management Medical Clinic for low back pain radiating down the right leg and numbness in the foot. Hunt was diagnosed with mechanical low back pain, episodic bilateral great toe and calf pain and numbness associated with evening relaxation and straight leg position, and right S1 sensory deficit. (Tr. 219-20.)

On May 3, 2000, Hunt again sought relief for persistent low back pain and right leg pain. Dr. Gray diagnosed continued low back pain with recurrent right leg sciatica and probable reactive depression and altered Hunt's medications. (Tr. 285-86.)

On June 21, 2000, Hunt complained of right buttock pain with numbness on the bottom of both feet. On December 20, 2000, Hunt complained of back and right leg pain. The physician diagnosed discogenic low back pain with sciatica and recommended a lumbar diskogram. (Tr. 281.)

On January 3, 2001, Hunt had a follow-up appointment for his diabetes. At this appointment, Hunt was diagnosed with diabetes mellitus type II. (Tr. 312.) Between January 17, 2001 and June 12, 2002, Hunt had four check-ups, and was diagnosed all four times with hypertension and type II diabetes. (Tr. 302-311.)

Later that month, on January 31, 2001, Hunt again complained of back and leg pain and was diagnosed with chronic back and bilateral leg pain, probably discogenic in origin. (Tr. 277.) Similarly, on February 27, 2001, Hunt was diagnosed with discogenic, possible facetogenic low back pain with a bilateral sciatica. (Tr. 275.) Six months later, on August 10, 2001, Hunt sought treatment for sudden tingling and weakness in his lower legs. At this time, Hunt was diagnosed with degenerative disk disease at L5-S1 and unexplained intermittent episodes suggestive of mild paraplegia. (Tr. 270.)

On August 29, 2001, Dr. Harold R. Smith conducted a comprehensive neurologic evaluation of Hunt. Dr. Smith noted that Hunt had bilateral lower extremity and low back symptoms. A clinical examination revealed reduced muscle stretch reflexes in the lower

extremities and increased vibratory threshold below the mid tibia bilaterally with position sense spared but with reduced sensation to pin and temperature discrimination bilaterally in a distal stocking distribution with relative sparing of the dorsum of the feet. Otherwise, Dr. Smith deemed the clinical examination unremarkable. Dr. Smith also conducted an EMG survey, which revealed rare abnormal spontaneous activity in the feet intrinsic musculature. Dr. Smith's overall findings were that Hunt had a distal lower extremity symmetric sensory peripheral polyneuropathy, that was likely related to his diabetes mellitus type 2.

On March 8, 2002, Hunt was diagnosed with persistent back and bilateral leg pain, status post radiofrequency facet nerve ablation. (Tr. 264.) On March 29, 2002, Hunt reported to his physician that he had numbness and tingling in his legs.

On May 11, 2003, Dr. Katherine Adams performed a recheck on Hunt's diabetes. Dr. Adams concluded that Hunt had diabetes mellitus, which was poorly controlled, and hypertension.

At an October 31, 2003 physical examination, Hunt was diagnosed with post laminectomy syndrome with chronic lower back pain with degenerative facet arthritis at L5-S1, diabetic neuropathy, diabetes mellitus, hypertension and hyperlipidemia.

In May 2004, Dr. Paul Olive examined Hunt and concluded that he had a ruptured disc in his back. Dr. Olive noted that the patient has mild limitation of motion of the lumbar spine, but that a neurologic exam found the lower extremities intact including motor, sensory, and reflexes. Dr. Olive diagnosed degenerative disc disease, but noted

5

that Hunt had full range of motion of his hips, knees and ankles. An x-ray examination of Hunt's lumbar spine showed evidence of mild degenerative changes at L4-5. Dr. Olive recommended an exercise program. (Tr. 341.)

On July 19, 2004, Dr. Rana Mauldin completed a Residual Functional Capacity Assessment-Physical on Hunt. Dr. Mauldin concluded that Hunt retained the physical capacity to lift or carry 10 pounds frequently, lift or carry 20 pounds occasionally, stand or walk (with normal breaks) for a total of two hours in an eight hour day, sit (with normal breaks) for a total of six hours in an eight hour day, push or pull with no restrictions, occasionally climb, stoop, crouch and crawl, and frequently balance and kneel. Dr. Mauldin further concluded that Hunt had no visual or communicative limitations, but should avoid extreme cold, wetness and vibrations. (Tr. 346-49.)

On July 29, 2004, Hunt's diabetes was rechecked at St. John's Lebanon Internal Medicine. His sugars were still running between 160 and 200. He reported that he was depressed. The physician diagnosed diabetes mellitus, hyperlipidemia, hypertension and depression. (Tr. 407.)

On October 29, 2004, Hunt complained of back pain. He reported that he was having several episodes of right-sided chest pain when sitting and resting. He further reported a sharp pain radiating towards his back with shortness of breath. The physician diagnosed right sided chest wall pain, hypertension, diabetes mellitus and hyperlipidemia. (Tr. 404.) On the same day, a chest x-ray revealed degenerative changes in the thoracic spine. (Tr. 403.)

On December 10, 2004, Dr. Gary Kell examined Hunt and found that he had episodes of substernal chest pain along with nausea and some diaphoresis. Dr. Kell diagnosed type II diabetes mellitus, diabetic renal disease with nephritic range proteinuria, secondary hypertension (control probably suboptimal), obesity and increased atherogenic potential secondary to diabetes. (Tr. 380.)

At a January 27, 2005 follow-up appointment, Hunt complained of back pain that "at times is terrible." (Tr. 391.) The physician again diagnosed diabetes mellitus, poorly controlled; diabetic neuropathy; hypertension; hyperlipidemia and chronic back pain with degenerative joint disease with spondylolysis. (Tr. 391.) Between March 15, 2005 and April 29, 2005, Hunt's diabetes was rechecked three times. During these rechecks, Hunt indicated that he was experiencing significant pain in his lower back.

A June 17, 2005 MRI from Breech Regional Medical Center revealed mild degenerative joint disease of the L3-4 and L5-S1 and minimal disk protrusion at L5-S1. Otherwise, the imaging was "largely unremarkable." (Tr. 434.)

In a February 8, 2006 letter to Donald Hunt, Dr. Adams wrote:

> Mr. Donald Hunt is a patient of mine. He suffers from multiple disabling conditions. He has diabetes mellitus, insulin requiring, which is very difficult to control. He also has hypertension, hyperlipidemia, diabetic nephropathy and diabetic neuropathy. On top of all of those, he is quite physically disabled from severe spondylosis at T11-T12 and also a postlaminectomy syndrome at L5-S1 and facet degenerative joint disease at L5-S1. Since his back surgery in 2000, he didn't achieve much of improvement with chronic pain and he also is on a significant restriction in terms of lifting and considering all those conditions, he is a poor candidate for any employment.

7

> He applied for a job at different locations here locally at manufacturers and also at Wal-Mart and he was declined a job as he is high risk considering his insulin treatment and considering his restrictions with lifting, ambulation, bending over and repetitive movement.
>
> Unfortunately he is not able to obtain any employment here secondary to all these conditions that make him disabled.

(Tr. 447.)

### B. Summary of Hearing Testimony

At his June 29, 2005 hearing, Hunt testified that he was 5'7" and weighed 218 pounds. He has a driver's license and regularly drives to Wal-Mart and to his doctor appointments, though he indicated that he could not drive significant distances. (Tr. 51.)

Hunt testified that he worked until his surgery in January 2000. Hunt testified that he had headaches two or three times a week; numbness in his legs and pain in his lower back that shot down his legs. He testified that because of the pain he was unable to walk very far and could only stand and sit for brief periods. (Tr. 52.)

Hunt testified that he takes pain medication and rests for at least one hour when he has a headache. (Tr. 53.) He also testified that, when he experiences low back pain, extended standing, walking or sitting makes it worse. (Tr. 57.) Hunt testified that he could only be on his feet for about 20 minutes before he needed to rest and could only sit for 20 to 25 minutes before his pain became worse. He testified that if he walked for about a quarter of a mile, his back pain would increase and he had to get home and recline. (Tr. 56.)

Hunt described his typical day as follows:

> I get up, I, I have my daughter and my, my nephew that
> lives with -- you know, stays with us. I make him breakfast
> at 5:00 in the morning. I get up at 5:00. They get up at
> 6:00. I give them breakfast. Then I send them off to school.
> Make their lunches. And after that, I lay down. I sit in my
> chair for a little bit. And then I go down and feed the
> animals. That's where I get about a quarter-of-a-mile in. I
> go down and feed my animals. Come back and I have to sit
> in my chair, because the pain is just --- it's hurting really
> bad. And then I get up at lunchtime to have lunch. And I
> make myself lunch . . ..

(Tr. 58.)

Hunt has two donkeys, four cows, a Shetland Pony and 17 chickens. It takes approximately 45 minutes to feed them. He testified that he feeds the animals using three pound buckets and that he has to rest for about 15 minutes in the barn before he can finish. (Tr. 59.) Hunt also does laundry about once a week, but does not do any yard work. (Tr. 64.)

Hunt testified that he owns a classic car and goes to car shows once a month in Lebanon. (Tr. 62.) When he goes to car shows, Hunt brings his own chair so he can sit down whenever he needs to. (Tr. 63.)

The vocational expert testified that Hunt's past relevant work most closely relates to a finishing machine operator, which Hunt performed up to the heavy level. The vocational expert indicated that the Dictionary of Occupational Titles defines Hunt's past work as a semiskilled position, generally performed at the medium level of exertion. (Tr. 65.)

At the hearing, the ALJ posed the following hypothetical to the vocational expert: "If we assume a hypothetical person of the age, education and work history of Mr. Hunt and we assume that the testimony given as to limitations, is accurate. And accurately describes the person's limitations. Would you be able to identify any occupations that such a person could perform?" The vocational expert testified that the ALJ's hypothetical claimant would not be able to perform any occupations. (Tr. 65.)

The ALJ posed a second hypothetical that asked the vocational expert to review the medical records in evidence and assume that they represent an accurate description of a hypothetical person's limitations. The vocational expert testified that such a person could perform light, primarily sedentary work because such a person is limited to standing or walking for two hours in an eight hour day. Appropriate jobs would include table worker and office helper. (Tr. 65-67.)

The ALJ submitted a post-hearing interrogatory to the vocational expert. In his interrogatory answers, the vocational expert identified small products assembler and car wash attendant as other examples of occupations at the light exertional level. (Tr. 144.)

## II. Discussion

After consideration of the record, the ALJ determined that Hunt suffered from the severe impairments of degenerative disc disease of the lumbar and thoracic spine status post surgery, diabetes mellitus with peripheral neuropathy and obesity. (Tr. 24.) The ALJ also determined that Hunt did not have an impairment or combination of impairments listed in or medically equal to one found at 20 C.F.R. Part 404, Subpart P,

10

Appendix 1, the Listing of Impairments. (Tr. 31.) And, the ALJ found Hunt's subjective complaints were not entirely credible. (Tr. 27-28.)

After further consideration of the record, the ALJ found that Hunt had the residual functional capacity (RFC) to lift 20 pounds occasionally and ten pounds frequently; sit, with normal breaks, for six hours and stand or walk, with normal breaks, for six hours in an eight-hour workday. (Tr. 28.) The ALJ found that Hunt was unable to perform frequent or repetitive pushing or pulling with his legs. (Tr. 28-29.) But, he could frequently climb and balance and occasionally kneel, crouch, crawl, and stoop. (Tr. 29.) After obtaining interrogatories from the vocational expert, the ALJ determined that Hunt was capable of light, unskilled jobs including small products assembler and car wash attendant. (Tr. 30.) Thus, the ALJ found that Hunt was not disabled. (Tr. 30.)

### A. Hunt's Subjective Complaints

Hunt argues that the ALJ erred in finding his subjective complaints were not fully credible. Prior to rejecting a claimant's subjective complaints, the ALJ is required to make an express credibility determination explaining why he does not fully credit the claimant's complaints. *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000). "If an ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so, we will normally defer to that judgment." *Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001) (quoting *Dixon v. Sullivan*, 905 F.2d 237, 238 (8th Cir. 1990)). In this case, the ALJ articulated several inconsistencies which supported his credibility determination. (Tr. 27-28.)

In *Johnson v. Apfel*, the Eighth Circuit held that activities inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility. *Id.*, 240 F.3d 1145, 1148 (8th Cir. 2001). In this case, the ALJ noted that Hunt's reported daily activities were fairly normal in contrast to his reported functional limitations. (Tr. 27.) Hunt owned two donkeys, four cows, a Shetland pony and 17 chickens, which he walked a quarter mile to feed everyday. (Tr. 59.) Hunt washed dishes, prepared meals, vacuumed, and shopped for groceries once a week. (Tr. 27, 128.) He attended classic car shows once a month. (Tr. 27, 63, 129.) Hunt watched television, read, worked on his computer, and drove. (Tr. 27, 129.) He left his home every day without difficulty. (Tr. 27, 129.) Hunt walked to his in-laws where he stayed for two hours or ran errands for several hours. (Tr. 27, 129.) Although Hunt's daily activities demonstrate that he suffers from some limitations as a result of his impairments, overall they are inconsistent with an individual who is incapable of performing any substantial gainful activity.

The ALJ also noted that the medical evidence did not entirely support his allegations of ongoing disabling pain. (Tr. 27.) The ALJ acknowledged that Hunt suffered from a back injury in 1999 and ultimately required a laminectomy in January 2000, as well as radio-frequency facet denervation at L2, L3, L4, L5, and S1 in December 2001. (Tr. 24.) However, Hunt has already been found to not have been disabled during that period. The relevant time frame for the present case begins on his alleged onset date of April 16, 2004. The ALJ observed that examinations performed during the relevant

12

Case 6:06-cv-03205-NKL   Document 11   Filed 02/21/07   Page 12 of 18

period did not reveal any severe conditions that could be expected to produce his reportedly disabling pain. (Tr. 27-28).

A May 2004 x-ray examination of Hunt's lumbar spine showed only "mild" degenerative changes at L4-5. (Tr. 341.) And, a MRI examination in June 2005 showed "mild" degenerative joint disease at L3-4 and L5-S1 with "minimal" disk protrusion at L5-S1, but was considered "largely unremarkable." (Tr. 434.) A post-hearing consultative examination revealed normal motor strength, sensation and gait. (Tr. 437-38.) Hunt could walk on his heels and toes and his grip strength was normal. (Tr. 437.) His range of motion was intact except for 15 degree reduction of lumbar extension-flexion, and positive straight leg raising at 25 degrees while supine. (Tr. 440.) Seated straight leg raising was normal. (Tr. 440.) Dr. Greenburg found no symptoms of diabetic neuropathy or vascular secondary effects. (Tr. 438.) The objective evidence from the relevant period does not support Hunt's subjective complaints of disabling pain and functional limitations.

In addition, the ALJ found that, despite Hunt's noncompliance with treatment, his diabetes was generally well controlled with medication. (Tr. 28.) Despite his spotty compliance with treatment for diabetes, Hunt did not suffer from diabetic retinopathy. (Tr. 25, 343.) Impairments that are controllable or amenable to treatment do not support a finding of disability. *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998).

The ALJ also observed that, despite Hunt's complaints that his medication caused side effects, there was little evidence in the record that he reported such complaints to his

13

physicians. (Tr. 14, 28.) Hunt's failure to report these side effects to his physicians weighs against his credibility when reporting them for the purpose of obtaining disability benefits. *Zeiler v. Barnhart*, 384 F.3d 932, 936 (8th Cir. 2004).

In summary, the ALJ identified inconsistencies in the record which provided a sufficient basis upon which to discount Hunt's contention that he is unable to perform even simple work.

### B. The ALJ Properly Evaluated Hunt's Residual Functional Capacity.

Having found that Hunt was only partially credible as to the alleged extent of his impairments, the ALJ went on to determine Hunt's residual functional capacity.

Hunt argues that the ALJ failed to properly consider the entire record when assessing his residual functional capacity, specifically evidence from the time of his initial injury and subsequent surgical procedures. (Pl.'s Br. at 31-37.) Hunt, however, previously applied for disability benefits and an ALJ found that he was not disabled through April 15, 2004. (Tr. 70-83.) Hunt did not appeal this determination and it is now administratively final. *See* 20 C.F.R. § 404.955. Thus, the issue before the Court is whether the ALJ's decision concerning Hunt's RFC from April 16, 2004, through December 9, 2005, is supported by substantial evidence.

Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted. *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) (citation omitted). An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered. *Id*. (citation omitted). In this case, the ALJ

considered all of the evidence, including the procedures Hunt underwent prior to the relevant period. (Tr. 24.)

The ALJ specifically stated that there was no "current evidence of an abnormality of the spine" that would explain Hunt's reported symptoms. (Tr. 27.) Objective testing during the relevant time period revealed only mild abnormalities that were inconsistent with Hunt's asserted level of pain. The ALJ also concluded that Hunt's complaint of chronic pain is not supported by any observable manifestations. (Tr. 28.) This statement by the ALJ is consistent with the policy set forth in Social Security Ruling (SSR) 96-7p.

Hunt argues that the ALJ should not have afforded any weight to the opinion of Dr. Maudlin, the state agency reviewing physician, because her opinion was "stale" and the record was not complete at the time she rendered her opinion. (Pl.'s Br. at 38-39.) ALJ's are not bound by any findings made by state agency medical or psychological consultants. However, these findings are considered at the hearing level. *See* 20 C.F.R. § 404.1527(f)(2). Further, the record shows that the ALJ did not adopt Dr. Maudlin's opinion. (Tr. 29.) The ALJ specifically wrote that his opinion differed because he had taken into account the "the record as a whole, including all medical evidence and the testimony received at the hearing, and are thus based on evidence that was not available to the State agency consultant." (Tr. 29.) Accordingly, the fact that Dr. Maudlin did not have access to all of the evidence and rendered her opinion earlier in the disability process does not undermine the ALJ's final RFC determination.

Hunt also argues that the ALJ should have afforded greater weight to the opinions of Dr. Maddox and Dr. Gray. (Pl.'s Br. at 39.) However, neither of these doctors treated Hunt during the relevant period or offered any opinion on his ability to perform work-related activities during the relevant period. Hunt has submitted no evidence that he was examined by either Dr. Maddox or Dr. Gray after March 2002, over two years before his alleged onset date. Because these physicians had no treatment relationship with Hunt during the relevant period and offered no opinions concerning Hunt's functioning at any time during the relevant period, the ALJ was correct in not affording any weight to their opinions.

Hunt further argues that the ALJ should not afford any weight to the opinions of the consulting physicians who examined Hunt during the relevant period because they did not have an opportunity to review all of the medical evidence. (Pl.'s Br at 39-41.) The purpose of the consultative examinations was to assess Hunt's current level of functioning, not provide a retrospective opinion, which could only be rendered by a physician with a treating relationship to Hunt. Hunt has submitted no evidence that the consultative examinations performed in May 2004 and July 2005 were not properly based on the evidence pertaining to Hunt's functioning during the relevant period. Therefore, the ALJ could consider these reports in assessing Hunt's RFC.

Hunt also argues that the ALJ erred in giving any weight to the RFC estimate provided by Dr. Greenburg. (Tr. 442-45.) A review of the ALJ's final RFC determination, however, shows that it was far more restrictive that Dr. Greenburg's

opinion. The ALJ found that Hunt could lift only 20 pounds occasionally and ten pounds frequently whereas Dr. Greenburg found that Hunt could lift 50 pounds occasionally and 25 pounds frequently. (Tr. 26, 28.)

Finally, Hunt argues that the ALJ failed to consider his obesity in determining his RFC. (Pl.'s Br. at 42-43.) In his decision, the ALJ specifically noted that Hunt was obese and limited Hunt to light exertional level work with significant postural limitations. (Tr. 28-29.) The ALJ sufficiently considered Hunt's obesity where he specifically referred to his obesity in the decision. *Brown ex rel. Travis v. Barnhart*, 388 F.3d 1150, 1153 (8th Cir. 2004).

### C. The Appeals Council Properly Considered New Evidence Submitted After the ALJ's Decision

Hunt argues that new evidence submitted to the Appeals Council after the ALJ's decision would have compelled the ALJ to find him disabled. (Pl.'s Br. at 48-50.) The new evidence consists of several treatment records and a letter from Dr. Adams stating that Hunt was disabled due to uncontrolled diabetes mellitus, severe spondylosis at T11-12, and post laminectomy syndrome and facet degenerative disease at L5-S1. (Tr. 447.) The Court's role "is limited to deciding whether the Administrative Law Judge's determination is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made." *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994).

The new treatment records, however, do not suggest disability any more than the information before the ALJ at the time he made his determination. The fact that Dr.

Adams considers Hunt disabled is not controlling. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004) (holding that physician's statement that claimant is disabled was a legal conclusion that need not be given controlling weight by an ALJ). Furthermore, Dr. Adams's letter indicates that Hunt applied for jobs but was rejected because he is diabetic and has back problems. The fact that Hunt applied for jobs undercuts his reported belief that he is disabled. *Bentley v. Shalala*, 52 F.3d 784, 786 (8th Cir. 1995). And, the fact that he could not get hired is irrelevant for purposes of obtaining disability benefits. *See* 20 C.F.R. §§ 404.1566(a), 4041566(c); *Thomas v. Sullivan*, 928 F.2d 255, 261 (8th Cir. 1991) (hireability not to be considered).

Therefore, the additional evidence, even if it had been considered by the ALJ, would not have changed the outcome of this case.

### III. Conclusion

Because the Court concludes that the decision of the ALJ is supported by substantial evidence on the record as a whole, it is hereby

ORDERED that Hunt's Motion for Summary Judgment [Doc. # 7] is DENIED and the decision of the ALJ is AFFIRMED.

    s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: February 21, 2007
Jefferson City, Missouri